IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------x
                                    :
CRAIG WILSON                   :
                                    :                           09 CV 937 (JGM)
V.                                       :
                                    :
ROBERT MARTIN              :                         DATE: MARCH 26, 2014
                                    :
---------------------------------------------x

MEMORANDUM OF DECISION

On June 12, 2009, plaintiff, Craig Wilson, commenced this action pro se against defendants Robert Martin, Anthony Laquinto, and John Does 1-20 arising out of plaintiff's arrest by the Bridgeport Police Department's Fugitive Task Force on June 26, 2006. (Dkt. #1).[1] On September 17, 2009, defendants filed their answer (Dkt. #9). On July 24, 2012, defendant Laquinto filed a Motion to Dismiss (Dkt. #54; see also Dkts. ##48, 50-51, 53, 57, 59), which motion was granted absent objection. (Dkt. #58). On March 11, 2014, plaintiff filed his Amended Complaint against defendant Robert Martin only, in which he alleges that defendant Martin "subjected . . . [p]laintiff to unreasonable, excessive and deadly force" in violation of the Fourth Amendment of the United States Constitution as enforced through 42 U.S.C. §§ 1983, 1988. (Dkt. #101).

On May 24, 2012, counsel was appointed for plaintiff (Dkt. #41; see Dkts. ##15-16, 25-27, 30), and on June 7, 2012, the parties consented to trial before this United States Magistrate Judge. (Dkt. #45).[2] On March 24, 2014, a bench trial was held before the

---

[1] Along with his Complaint, plaintiff filed a Motion for Leave to Proceed In Forma Pauperis, which motion was granted on July 2, 2009. (Dkts. ##1, 3).

[2] This Magistrate Judge handled discovery from the beginning of this litigation (see Dkts. ##13-14, 18, 24), and in August 2010, United States District Judge Janet Bond Arterton formally

1

undersigned[3] at which plaintiff, defendant, Sergeant Eddie Correa of the Bridgeport Police Department, Detective Alex Fucci of the Fairfield Police Department, and Joan Bonafilia, a nurse for the Connecticut Department of Corrections ["DOC"], testified. (Dkts. ##107-08; see Dkts. ##62-75, 77, 79-82, 85-88, 90-91, 93-94, 97-99, 102-03).

For the reasons set forth below, judgment shall enter in favor of defendant.

## I. FACTUAL FINDINGS

The following constitutes the Court's findings of fact pursuant to FED. R. CIV. P. 52(a)(1):

Plaintiff is incarcerated in Suffield, Connecticut at MacDougall-Walker Correctional Institution. His current incarceration arose out of the arrest that gave rise to this current litigation.

On June 26, 2006, defendant Martin, a detective with the Bridgeport Police Department for the past twenty years and who has been on the police force for twenty-five years, went to the home of Mabel Daniels on Chestnut Street in Fairfield, Connecticut, with the intent of finding plaintiff, or obtaining information that would lead to his arrest; plaintiff and Daniels are friends. Detective Martin had outstanding warrants for plaintiff's arrest and he went to Daniels' home in his role as a member of the fugitive task force. Plaintiff and Detective Martin were "familiar" with one another prior to this encounter; plaintiff testified that Daniels was also familiar with Detective Martin. When Detective Martin arrived at Daniel's duplex, plaintiff was inside with Daniels, his mother, and a few friends, including

---

referred the case to this Magistrate Judge to resolve discovery disputes (Dkt. #26; see Dkts. ##28, 31; see also Dkts. ##65-67, 69), to rule on motions to appoint counsel (Dkts. ##26-27; see Dkt. #30); and for settlement (Dkt. #36; see Dkts. ##38-39, 43, 46).

[3]On March 14, 2014, the parties waived their right to a jury trial and consented to a bench trial. (Dkt. #102).

children. Plaintiff was upstairs when Detective Martin first knocked on Daniels' door and plaintiff had come to the top of the stairs to look who was there; before Daniels opened her front door, she told plaintiff that the police were there and he then tried to try to hide on the second floor.

Detective Martin asked Daniels if he could search the premises but she refused to permit him to enter without a warrant, which he did not have. Detective Martin assumed someone was upstairs as he had heard noises from there, and according to plaintiff, when he was walking around upstairs, the floor squeaked. Plaintiff "peeked" out the window and he could see police officers standing outside, including Detective Martin, who was the only officer he recognized. While he was looking out the window, he was planning his escape route, and as soon as he saw some of the other officers walk down the driveway, he saw his "best chance" to escape, by pushing the screen out of the open window, stepping on the landing of the roof below and then jumping to the ground. As he went out the window, Detective Martin saw him, yelled "he's out the window," and removed his gun from the holster. Detective Martin was pointing the gun at plaintiff when plaintiff jumped to the ground, and he immediately gave chase. Plaintiff and Detective Martin were approximately twelve feet apart, with Detective Martin chasing right behind plaintiff as he ran toward the back of the house where there was marshland; plaintiff was well aware that Detective Martin was right behind him. Plaintiff could hear Detective Martin yelling, as he recognized his voice, but with his adrenaline pumping, he could not hear what he was saying. Plaintiff heard gunshots fire (which he described as "pop, pop, pop"); Detective Martin, who was running with his hand on the trigger, discharged two bullets from his forty-caliber semi-

automatic Sig Sauer service revolver.[4]  As he discharged the first shot, he immediately looked toward his right hand in which he was holding his weapon and he saw the second round eject downward into the ground ("discharge into the soil").  A second officer, Deputy Masterson, joined the pursuit with his gun drawn but no shots were fired from his weapon.

When plaintiff heard the gunfire, he laid down on the ground and placed his hands behind his head in order to protect himself. The entire chase lasted, at most, sixty seconds before plaintiff was apprehended. Plaintiff was unarmed.  He was placed under arrest and picked up, and he then walked over to cement steps by the front of Daniel's house where he sat down. While plaintiff was sitting on the steps, he described having a "burning" feeling on his neck, and his leg "felt funny" but he thought it was from the chase and from being "roughed up a little bit."  According to plaintiff, there was blood "all over" the white t-shirt he was wearing, and Detective Martin looked at the back of his neck[5] and told him he would be "alright." Detective Martin, however, testified that he did not notice any blood on plaintiff at all, and denies having had any conversation with plaintiff about plaintiff's neck.

At that point, Detective Alex Fucci from the Fairfield Police Department arrived on the scene and recognized plaintiff in handcuffs.  Detective Fucci witnessed another officer search plaintiff before placing him in the back of Detective Fucci's cruiser so that Detective Fucci

---

[4]Detective Martin acknowledged that in his first report of the incident, he did not report that his gun had discharged twice because he was "embarrassed" that he had been running with his finger on the trigger and that he had an "accidental trigger." Additionally, he did not report it initially because no one was around him when the gun discharged, no one had gotten hurt, and it had no bearing on plaintiff's arrest.  Eventually, however, after he reported this matter to his supervisor, he was ordered to make a report of the discharge.

Detective Martin also acknowledged that he never retrieved the two bullets or shells from the ground, nor did he ask another colleague to pick them up.

[5]Plaintiff has long dreadlocks that go down his back.  (See Exh. G).  The photographs of the back of plaintiff's neck, which were taken several years after this incident, do not reveal gunshot wounds.  (See Exhs. 7-8).

could transport plaintiff to be booked.  Plaintiff was not limping, he did not appear to be in pain, and Detective Fucci did not see any blood on him.  When Detective Fucci arrived at Troop G of the Connecticut State Police,[6] he turned plaintiff over to an officer in the sally port; he did not see any blood on plaintiff at that time either.  When he returned to his cruiser, he inspected the back seat of the car, which is his custom and practice, and he did not notice any blood in the back of the cruiser.  Detective Fucci also testified that when an arresting police officer discovers blood in the back seat of a police car, there is a "process" to be followed, which includes notifying a supervisor and filing a report.

Once inside, Sergeant Eddie Correa from the Bridgeport Police Department was responsible for booking plaintiff.  Booking involves patting down the arrestee several times, during which time, if blood is seen, the officer automatically calls a medic and transports the arrestee to the hospital for the safety of both the suspect and of the officers.  Sergeant Correa was clear that "any" amount of blood, no matter how small, triggers this obligation to contact a medic and transport the suspect.  Additionally, when an arrestee has a high bond, like the $1,000,000 bond set for plaintiff, a second officer stands in close proximity to the officer conducting the booking process.  Thus, two people would have been standing close to plaintiff during this process. Once the arrestee is fingerprinted, read his or her charges, and given the opportunity to make a phone call, the officer on duty asks if the arrestee has any medical conditions, has any injuries, or needs any medications, before returning the arrestee to the cell. Sergeant Correa testified that he would have remembered if a suspect had come in covered in blood and suffering from gunshot wounds, and he has

---

[6]At the time of this incident, the Bridgeport Police Department was using the headquarters for Troop G of the Connecticut State Police as their booking facility while their booking facility at the Bridgeport Police Department headquarters was undergoing renovations.

no recollection of the scenario plaintiff described. Additionally, although plaintiff claims that his white t-shirt was "dripping with" and was "covered in" blood, he conceded upon his cross-examination that in his booking photo, there is no blood on plaintiff's white t-shirt. (Exh. G).

Plaintiff claims the bullet wound in his leg was such that the bullet entered in the back of his leg and exited on the side of his left leg near the back of his knee (described by defense counsel as a "through and through" bullet wound); he lifted his pant leg in the courtroom to show the entry and exit scars. (See Exhs. 1-6). In or around 2000, plaintiff was shot in his left leg and in his ankle (see Exh, H,[7] Bates Stamp DOC25, DOC26, DOC28[8]), and for each of those injuries, he was hospitalized for a "day or so." However, in this case, he claims that he did not even know he was shot in the leg until he was in lockup. Moreover, even after he allegedly discovered he had entry and exit bullet wounds in his leg, in addition to the bullet wound in the back of his neck, plaintiff did not tell anyone at Troop G that he was suffering from gunshot wounds out of fear that telling officers that he was shot by another officer would make matters "worse" for him. Additionally, he did not tell the Connecticut Judicial Marshals who transported him to court the next day, he did not tell his public defender, and he did not tell the Connecticut Superior Court Judge before whom he appeared that he had been shot in his leg and neck, and none of these parties noted plaintiff's shirt that had been "dripping" with blood. Plaintiff claims that once he was incarcerated at the North Avenue jail, he cleaned his wounds with alcohol pads and iodine, and he used a sock to wipe up the blood. He described the bullet to his neck as "just [having] broke[n] the grain" of his skin. He did not seek medical attention because his

---

[7]Exhs. E and H are identical, except that Exh. E is missing the Bates Stamp numbers.

[8]Under "Significant Medical History," all three entries, from 2008-09, indicate "GSW [gun shot wound]" at left leg and ankle "8 yrs ago."

wounds were not life threatening, and although the "one on the leg hurted[,] [sic]" he decided to "suck it up."

The medical records from his intake health screening from the DOC completed the next day, on June 27, 2006, reveals that he had no significant medical injuries. (Exh. H, DOC49-52).[9] Additionally, he reported no history of trauma and no current medical problems, he was "laughing[,]" and his mood was recorded as normal, with his statement, "I feel good[.]" (Id. DOC53; see also id. DOC55-56 (no indication of recent trauma)). Joan Bonafilia, a nurse with the DOC, completed some of the foregoing paperwork after examining plaintiff upon his admission to MacDougall. She testified that if he had reported any recent injuries or traumas (which he did not), he would have been sent to UConn Health Center for treatment. When asked if she has ever had someone admitted to the DOC who was shot a few days prior, she said such a scenario has "never happened."

## II. CONCLUSIONS OF LAW

The following constitutes this Court's conclusions of law pursuant to FED. R. CIV. P. 52(a)(1):

The use of excessive force by police officers prior to arraignment violates the Fourth Amendment's prohibition against unreasonable seizures. See Graham v. Connor, 490 U.S. 386, 395 (1989). "[A] police officer['s] application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004), quoting Graham, 490 U.S. at 397. To prevail

---

[9]Although plaintiff testified that entry and exit bullet wounds caused the type of pain that he decided to "suck . . . up" rather than seeking treatment from DOC, plaintiff did seek and receive treatment from the DOC for a face rash, for eye drops, for acne, for dandruff, for dry skin, and for lactose intolerance. (Exh. H, DOC 3, 4, 8, 14, 20).

on his excessive force claims, plaintiff must show that the amount of force used was objectively unreasonable, either as to when or how the force was applied, and that as a result of the use of force, he suffered some compensable injury. <u>Ferraresso v. Town of Granby</u>, 646 F. Supp. 2d 296, 306-07 (D. Conn. 2009); <u>Brooks v. Siegler</u>, 531 F. Supp. 2d 323, 329 (D. Conn. 2008).

In this case, the Court need not address whether the use of deadly force was excessive force and unreasonable under the circumstances because plaintiff cannot establish that he was in fact shot by Detective Martin. Detective Martin admits that he discharged his service revolver twice while in pursuit of plaintiff. However, other than plaintiff's testimony, there is no evidence establishing that plaintiff was in fact shot in his neck and leg. Not one person who encountered plaintiff during or after this incident noticed any blood on plaintiff's t-shirt, or noticed that he was in any pain or was limping, and his booking photograph shows plaintiff in a white t-shirt, without any sign of blood. Additionally, the scars shown in Court were on his left leg, the same leg where he received bullet wounds in or around 2000. In light of plaintiff's previous gunshot wounds, both of which required in-patient hospitalizations, this Court finds incredible plaintiff's claim that he had these large bullet wounds but chose not to tell anyone and chose not to seek any treatment.

### III. CONCLUSION

Accordingly, for the reasons stated above, the Clerk shall enter <u>judgment in favor of defendant</u>.

Dated this 26th day of March, 2014, at New Haven, Connecticut.

/s/ Joan G. Margolis, USMJ
Joan G. Margolis
United States Magistrate Judge